UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     STEPHEN A. KORFONTA | ) | Case No. 08-16675-SSM |
| | ) | Chapter 7  (Involuntary) |
|                   Debtor | ) | |
| | ) | |
| SJM PROPERTIES, *et al.* | ) | |
| | ) | |
|                 Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1103 |
| | ) | |
| STEPHEN A. KORFONTA | ) | |
| | ) | |
|                 Defendant | ) | |

**MEMORANDUM OPINION**

Soonja M. Purdy entered into contracts to purchase two houses to be constructed by Seville Homes, LLC ("Seville") and paid Seville a total of $146,498 in deposits. Although construction was largely completed on one of the houses, the other was not begun, and the lots—which required subdivision of an existing parcel—were never formally recorded before the construction lender foreclosed. Ms. Purdy purchased the house and unsubdivided lot from the lender and now seeks a money judgment against Stephen A. Korfonta, the manager and sole member of Seville, for the amount of the deposits she paid. For the reasons stated, judgment will be entered in her favor.

1

Findings of Fact

On October 28, 2008, three creditors filed an involuntary petition against Stephen A. Korfonta ("the debtor") for relief under chapter 7 of the Bankruptcy Code.  The petition was not opposed, and an order for relief was entered on January 13, 2009.  On his schedules, the debtor listed $22,423,853 in general unsecured claims, the great bulk of which arise from his operation of Seville, of which he was the managing member.  Seville was itself an involuntary chapter 7 debtor in this court on a petition filed some two and a half months earlier.[1]  Among the creditors listed on the debtor's schedules was "Naomi Purdy," who is shown as the holder of a non-contingent, liquidated, undisputed claim in the amount of $144,948 for "Deposit."  The United States Trustee brought an adversary proceeding to deny the debtor a discharge for, among other reasons, failing to maintain and preserve records from which his and Seville's financial condition could be determined, and an order was entered on December 2, 2009, denying the debtor a discharge.  The trustee has filed a report of no distribution.

The events giving rise to the present litigation date back to 2002.  Seville was an established builder of large "in-fill" homes in existing residential developments.  A real estate broker approached the debtor with an opportunity to purchase six contiguous parcels fronting on Evergreen Lane in Annandale, Virginia.  The existing zoning on the parcels allowed two houses per acre, but with re-zoning and re-subdivision, as many as thirteen houses might be constructed.  Four of the parcels were owned by a Dr. Nguyen, and the other two were owned by the broker.  Seville obtained preliminary ("conceptual") approval for a twelve-lot subdivision.  Relevant to

---

[1] *In re Seville Homes, LLC*, No. 08-14643-SSM (Bankr. E.D. Va., pet. filed August 3, 2008).

the present litigation, an existing parcel known as Lot 4 was to be divided into new Lots 8 and 9 and an outlot.

Soonja M. Purdy is the principal real estate broker for SJM Properties. After Seville placed signs advertising that new houses were to be constructed on the Evergreen Lane land, she signed contracts on March 11, 2003, for the purchase (in her own name) of homes to be constructed on Lots 8 and 9. (Ms. Purdy also produced contract purchasers for at least nine of the remaining lots, with each of those contracts recognizing SJM Properties as the "selling" real estate broker.) Each of Ms. Purdy's contracts was for $769,000, and each required a deposit of $76,900 with the seller, with half of to be paid "at contract" and half "at foundation." The paragraph of the contract addressing the deposit provided check boxes for specifying whether the deposit—which would be credited to the purchaser at settlement—was to be paid to the listing broker, the selling broker, the settlement agent, or the seller. For the contracts in question, the box for "Seller" was checked and the boxes for "Broker" and "Settlement Agent" were unchecked. The contract provided, "*If held by the Broker or the Settlement Agent*, the Deposit shall be held in escrow. . . ." (emphasis added).

Ms. Purdy gave Seville deposits of $38,450 on each lot at the time she signed the Lot 8 and 9 contracts. She later paid Seville $40,000 as the second deposit on Lot 8 and two payments, one of $14,975 and the other of $14,623, for upgrades on the house to be constructed on that lot. Construction started on what was supposed to be the Lot 8 house in 2004, but construction was only about 60% completed when Seville's lender, Severn Bank, foreclosed on what was still Lot 4, since the resubdivision into Lots 8 and 9 had never been completed. Following the foreclosure sale, Ms. Purdy bought Lot 4 and its partially-completed house from

3

Severn for $615,000. She then borrowed $200,000 from Severn Bank to finish the construction of the house, which is currently being rented for approximately $500 a month less than her mortgage payments.

The debtor testified that in 2003—when Seville contracted to sell the homes it intended to construct—Annandale was a "hot" area for real estate development. Seville was an experienced developer and, ironically enough, had previously built the house in which Ms. Purdy still resides. Construction was actually begun on three lots, including Lot 8 which Ms. Purdy had contracted to purchase. The foundation was poured, the framing, roof, and brick work were completed, the electrical, plumbing, and heating were "roughed in," the dry wall was hung, the driveway was put in, and the lot was sodded. The work that remained to be completed when construction stopped at the end of 2007 was primarily the flooring and the appliances.

Of the six existing parcels that Seville needed for final subdivision approval, five had been conveyed to Seville by 2003. The remaining parcel was owned by a Dr. Nguyen, who operated his practice from the building, and who delayed settling. As a result, Seville never obtained the final subdivision approval that would have been needed to convey title to the resubdivided lots.

In an examination conducted by the United States Trustee under Rule 2004, the debtor testified that he was the sole manager and member of Seville. When asked what type of compensation he received, he replied:

> Well, there was no set compensation. I would just, there was never any monthly or weekly pay checks paid to myself. My cars that I used were under Seville Homes, leased under Seville Homes.
> And, you know, certainly some monies under the Seville Homes account came to my personal account. . . . I think the way with a one-person LLC is the way you get, you calculate how much you made at the end of the year is you buy

>a piece of land, you build a house on it, the land cost so much, the house cost so much. You sell it for a certain price, and at the end, after you figure in what it cost and then also your staffing bills, there is a net amount that you make and per one house, and that's considered your income according to these accountants.

Tr. 6/25/09, p. 10-11. When asked what compensation he thought he had received in 2007 and 2008, the debtor stated, "I would say none," but then explained:

>I – the way I paid for my mortgage payment on my house was I kept refinancing my house and taking money to pay the mortgage and throw into the company. Same thing with a condo in Miami that had some equity in it. I had a condo up here in Arlington at Prospect House that I've refinanced. So I don't – I never paid myself. Again, we all operated out that one Seville Homes account, and, you know, I would make all those interest payments every month, the car payments.

*Id*. at 14-15. When asked specifically whether he paid personal expenses out of the Seville Homes account, the debtor responded:

>I don't think so. I think I would transfer some money from Seville Homes to my personal account to pay a couple personal mortgages. But other than that –[.]

*Id*. at 16. Later in the deposition, however, he responded affirmatively when asked whether Seville Homes paid any of his personal bills, although he was unable to provide an estimate of the amount. *Id.* at 49. The two leased cars had payments totaling $2,150 per month, and the debtor, who had no other vehicles, used them for both business and personal use. *Id.* at 24-25.

Discussion

I.

Ms. Purdy asserts that the debtor is personally liable for the return of the $144,948 she paid to Seville, and that the debtor's liability is nondischargeable on the ground either of fiduciary defalcation or conversion. This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. Under 28 U.S.C. § 157(b), a

5

Case 09-01103-SSM    Doc 40    Filed 10/26/10    Entered 10/26/10 11:30:23    Desc Main
Document      Page 6 of 16

Case 09-01103-SSM    Doc 40    Filed 10/26/10    Entered 10/26/10 11:30:23    Desc Main
Document      Page 6 of 16

determination of dischargeability is a core proceeding in which a final judgment may be entered by a bankruptcy judge, subject, of course, to the right of appeal.  Venue is proper in this district under 28 U.S.C. § 1409(a).  The defendant has been properly served and has appeared generally.

II.

There is, however, a threshold issue as to exactly what controversy is properly before the court and the extent of the court's jurisdiction.  Although the complaint is framed as one to determine the dischargeability of a debt, that precise issue is moot because the debtor has been denied a discharge, with the result that *all* liabilities that were or could have been scheduled in his case have been rendered nondischargeable.  § 523(a)(10), Bankruptcy Code.  As will be discussed, the evidence does not support a finding that the debtor, in negotiating and signing the contract with Ms. Purdy, was guilty of fraud, fiduciary defalcation, or conversion.  The controversy, therefore, is whether the debtor—who is not otherwise liable for Seville's debt to Ms. Purdy—can be held liable to her under a veil-piercing or alter ego theory, and the initial question the court must consider is whether that particular determination falls within the jurisdictional grant of 28 U.S.C. § 1334.

The court concludes that it does.  A determination of the dischargeability of debt is a core bankruptcy proceeding.  28 U.S.C. § 157(b)(2)(I).  Courts, including the district court for this district, are in agreement that such jurisdiction extends to entry of a money judgment liquidating the nondischargeable debt.  *Harris v. United States Fire Ins. Co. (In re Harris)*, 162 B.R. 466, 468 (E.D. Va. 1994); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 793 (10th Cir. 2009); *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 478-80 (5th Cir. 2009); *Valencia v. Lucero (In re Valencia)***,** 213 B.R. 594, 595 (D. Colo. 1997).  Indeed, "once

equitable jurisdiction has been properly invoked it will proceed to render a full and complete disposition of the controversy." *Harris*, 162 B.R. at 468. The court's authority to liquidate a non-dischargeable debt is unaffected by a denial of the debtor's discharge under § 727. *Belveal v. West (In re West)*, No. 06-1022, 2007 WL 4563444 (Bankr. W.D. Ky. Dec. 21, 2007) (entered judgment for plaintiff under § 523(a)(2)(A) and denied debtor a discharge under § 727(a)(2)(A)); *General Motors Co. v. Heraud (In re Heraud)*, 410 B.R. 569 (Bankr. E.D. Mich. 2009) (granting summary judgment for plaintiff, denying discharge under multiple subsections of § 727(a), and denying debtor's discharge from a particular debt under § 523(a)(2)(A) and (a)(6) and dismissing as moot the claim asserting that the debtor should be nondischargeable under § 523(a)(4)). The court thus proceeds to a consideration of the merits.

### III.

The complaint alleges that the debtor's actions in not maintaining Ms. Purdy's deposits intact in an escrow account and in using those funds for Seville's and the debtor's own purposes constitutes fraud or defalcation by a fiduciary and willful injury to property. In this connection, a chapter 7 discharge does not discharge an individual debtor from debts—

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> * * *
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

§ 523(a)(4), (6), Bankruptcy Code.

With respect to the claim under § 523(a)(4), it seems clear that failure by an escrow agent to account for funds deposited with him under a written agreement calling for their segregation would constitute a fiduciary defalcation. *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d

7

493 (4th Cir. 2008). In *Strack*, the president of a farming equipment dealer had not complied with a provision of a floor plan financing agreement requiring the dealership to segregate the proceeds of sale of the floor-planned equipment and to hold them in trust for the manufacturer and instead had used the funds to pay other business expenses. On those facts, the Fourth Circuit held that the resulting liability was excepted from discharge under § 523(a)(4) as a fiduciary defalcation. Importantly, the Fourth Circuit noted that "defalcation" does not require that the act "rise to the level of . . . 'embezzlement' or even 'misappropriation'" but could be satisfied by "[N]egligence or even an innocent mistake which results in . . . [the] failure to account[.]" *Strack*, 524 F.3d at 498, n.7 (alterations in original). The difficulty in this case, however, is that the sales contract did *not* require Seville Homes, which was the seller under the contract, to hold the deposit in escrow. That requirement, under the plain terms of the contract, arose only if the deposit were held by the *broker* or the *settlement agent*. No other authority has been cited by Ms. Purdy that would require a seller of real estate to hold a purchaser's deposit in a segregated account. Thus, the court concludes that Ms. Purdy's deposit could properly be used by Seville for general business purposes and was not required to be held in escrow, and that Seville was not a fiduciary of those funds within the meaning of § 523(a)(4), Bankruptcy Code.

With respect to the claim under § 523(a)(6) for willful and malicious injury, willfulness requires an intentional injury, not merely an intentional act that results in injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The requirement that the conduct be "malicious," however, does not require that a debtor bear subjective ill will toward the creditor; it is sufficient that a debtor's injurious act is done "deliberately and intentionally in knowing disregard of the rights of another." *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d

664, 667 (4th Cir. 1995). Conversion can constitute a willful and malicious injury to property for the purpose of § 523(a)(6). *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 331-332, 55 S.Ct. 151, 153, 79 L.Ed 393 (1934) (dicta) (decided under former Bankruptcy Act of 1898); *Harmon v. Scott (In re Scott),* 203 B.R. 590, 598 (Bankr. E.D. Va. 1996); *Richmond Metropolitan Hosp. v. Hazelwood (In re Hazelwood)*, 43 B.R. 208, 213 (Bankr. E.D. Va. 1984). As the Supreme Court cautioned in *Davis,* however,

> [A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Id.* at 332, 55 S.Ct. at 153 (internal citations omitted); *see also Branch Banking & Tr. Co. of Virginia, Inc. v. Powers (In re Powers),* 227 B.R. 73 (Bankr. E.D. Va. 1998) (post-*Geiger* decision holding that debtor's conversion of bank's collateral by delivering it to another creditor was not a willful and malicious injury where debtor did not intend to injure the bank and intended to pay the debt in full).

      The fundamental problem with the claim for conversion is that the evidence does not show that either Seville or the debtor used or converted funds belonging to Ms. Purdy for their own purposes. As noted, nothing in the contract required that the funds be preserved. Their payment to Seville merely created an obligation to credit Ms. Purdy with those funds at settlement or to refund them if Seville was unable to close. Although Ms. Purdy points to the debtor's deposition testimony that Seville paid his personal expenses, the mere fact that Seville paid those expenses directly, instead of paying the debtor a salary, does not, without more,

establish a conversion of Seville's funds. Nor, in this case, is there other evidence that Ms. Purdy's funds were taken without any actual intent of building the two houses Ms. Purdy had contracted to purchase. One of the houses was largely completed, and the other could not be begun only because Dr. Nguyen's failure to close on the sale of his property to Seville prevented final approval of the subdivision plat which would have created a second building lot out of Lot 4. Accordingly, the court concludes that the evidence simply does not establish a conversion of Ms. Purdy's funds, let alone a willful and malicious one.

IV.

Although the court is unable to find that the debtor's liability is excluded from discharge under either § 523(a)(4) or (6), Bankruptcy Code, there can be little doubt that Seville itself is *contractually* liable to Ms. Purdy for the return of the $146,498 she paid for two houses that it never conveyed to her. At trial, counsel for the debtor argued that because Ms. Purdy ultimately purchased Lot 4 and the partially-completed house for significantly less than she had contracted to purchase the two lots into which Lot 4 was to be divided, she has not actually been harmed and therefore has no claim. The court cannot concur. It is true that had Seville performed, Ms. Purdy would have paid a total (putting aside upgrades) of $1,538,000, and that what she was actually out of pocket, according to the evidence, was the $146,498 she paid to Seville, the $615,000 she paid to Severn Bank, and the $200,000 she borrowed from Severn to complete the house, for a total of $961,498. But what she obtained was not the same as what she had contracted to purchase, which was two houses on two lots, not one house on a single lot, even if that one lot comprised the two expected lots. More importantly, there is no evidence that the $146,498 she paid to Seville was not incorporated into the building of the partially-completed

house and thus reflected in the price she paid to purchase it from the bank. In effect, she had to buy back from the bank the value her up-front payment had already contributed to the property. Accordingly, the court concludes that Ms. Purdy has a valid contractual claim for the entirety of what she paid Seville.

A.

The question then is whether the debtor, as the manager and sole member of Seville, is liable for Seville's obligation. At first blush, it may seem odd that the question is even asked, since the debtor's schedules, executed under penalty of perjury, list an obligation to Ms. Purdy and do not show it as disputed. As Ms. Purdy's counsel vigorously argued at trial, this court has previously held, albeit in a different context, that the scheduling of a debt as undisputed constitutes a judicial admission, which, unless corrected, is binding on the debtor. *In re McCarthy*, No. 04-10493-SSM, 2004 WL 5683383 (Bankr. E.D. Va., July 14, 2004). In that case, the debtor had objected to the allowance of several claims, one of which she had listed on her schedules as undisputed in the same amount as the filed proof of claim. As this court observed:

> Schedules in bankruptcy cases are required to be filed under penalty of perjury, and the entire functioning of the bankruptcy system assumes and depends upon the accuracy of the schedules. Not surprisingly, many courts have held that the listing of a debt on the schedules - without also describing it as disputed, contingent, or unliquidated - is a judicial admission, or alternatively, an evidentiary admission. *See In re Musgrove*, 187 B.R. 808 (N.D. Ga. 1995) (debtor could not argue in adversary proceeding to determine the dischargeability of a debt that he was not liable to the creditor, since his listing of the debt on his schedules as undisputed was a judicial admission); *In re Standfield*, 152 B.R. 528, 531 (Bankr. N.D. Ill. 1993) (holding that in chapter 13 case "[v]erified schedules and statements filed by [d]ebtors are not just pleadings, motions, or exhibits, they contain evidentiary admissions."); *Larson v. Groos Bank, N.A.*, 204 B.R. 502 (W.D. Tex. 1996) (noting that bankruptcy schedules "are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial

>  admissions."); *In re Leonard*, 151 B.R. 639 (Bankr. N.D. N.Y. 1992) (debtor's
>  scheduling of a secured debt as undisputed was an admission under Fed.R.Evid.
>  801(d)(2) of its validity, with the court characterizing the filing of schedules by
>  the debtor as "a solemn admission which, *unless corrected, binds him*.") (quoting
>  *Sovran Bank, N.A. v. Anderson*, 743 F.2d 223, 225 n.1 (4th Cir. 1984) (emphasis
>  in original)).

With respect to the claim that had been listed on the schedules as undisputed in the same amount as the filed proof of claim, the court held:

>  [T]o allow debtors to contradict their sworn schedules would plainly be contrary
>  to sound bankruptcy policy. Of course, to the extent that a debtor was genuinely
>  mistaken as to the validity or amount of the debt at the time the schedules were
>  signed, he or she has the right to amend the schedules at any time before the case
>  is closed. Fed.R.Bankr.P. 1009(a). Absent such amendment, however, the court
>  concludes that the scheduling of the debt as undisputed, non-contingent, and
>  unliquidated should be binding on the debtor.

*Id.*

In the present case, the debtor did not amend his schedules prior (or even subsequent) to the trial of the dischargeability action, and no compelling reason has been offered why he should not be held to his sworn admission that Ms. Purdy had a valid claim against him for the return of her deposit.  A judicial admission, to be sure, is not synonymous with judicial estoppel,[2] even

---

[2] Judicial estoppel operates to prevent a party from assuming inconsistent litigation positions.  In this circuit, judicial estoppel requires the following showing:

>  First, the party sought to be estopped must be seeking to adopt a position that is
>  inconsistent with a stance taken in prior litigation.  And the position sought to be
>  estopped must be one of fact rather than law or legal theory.  Second, the prior
>  inconsistent position must have been accepted by the court. . . . Finally, the party
>  sought to be estopped must have "intentionally misled the court to gain unfair
>  advantage."

*Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) (internal citations omitted).  In the present case, the criteria necessary for judicial estoppel to arise have not been met.  Although the debtor, in denying personal liability, is taking a position opposed to the position taken in the schedules,
(continued...)

though similar concerns animate both concepts, and there are undoubtedly circumstances in which good cause would exist for the court to relieve a party from the effect of such an admission. *See* Fed.R.Civ.P. 36(b); Fed.R.Bankr.P. 7036 (authorizing court to permit withdrawal or amendment of an admission "if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.") Here, however, no such circumstances have been articulated. For that reason, the court concludes that the debtor should be bound by his admission of personal liability.

B.

The court does note that, absent the debtor's admission, the evidence would probably not sustain a finding of personal liability. A limited liability company, like a corporation, is a legal entity separate and distinct from its members and managers. But just as the separate identities of a corporation and those behind it may be disregarded in extraordinary circumstances—thereby making the individuals liable for the debts of the enterprise—the same is true of a limited liability company. The Supreme Court of Virginia, however, has set a very high bar for this type of action. By piercing the veil, a court is effectively casting aside the statutorily-created cloak of limited liability and imposing upon the shoulders of investors the very financial obligations from which they sought to be sheltered at the time of incorporation. *Beale v. Kappa Alpha Order*, 192

---

[2](...continued)
whether that position—his legal liability for the debt of another—is properly characterized as a "fact" is less clear. But even if it were found to be a fact, there is no showing that the debtor's liability for the debt was ever "accepted by the court" in the administration of the bankruptcy case, since no distribution was made to creditors. As the Fourth Circuit has explained, "[t]he insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances." *Id.*

Va. 382, 395, 64 S.E.2d 789, 796 (1951). There can be little doubt that a free-wheeling application of veil piercing would have a chilling effect upon corporate investors, thereby frustrating the fundamental economic policies that undergird the corporate scheme. *See Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987).

Noting these concerns, the Supreme Court of Virginia has consistently held that "only 'an extraordinary exception' justifies disregarding the corporate entity and piercing the veil." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 266 Va. 3, 10, 580 S.E.2d 806, 810 (2003). As the Court explained:

> [N]o single rule or criterion can be applied to determine whether piercing the corporate veil is justified, and that the corporate entity will be disregarded and the veil pierced only if the shareholder sought to be held personally liable has controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage. Piercing the corporate veil is justified when the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice.

*First Flight*, 266 Va. at 10, 580 S.E.2d at 809-10 (internal citations omitted). The Court further explained that "[t]he decision to disregard a corporate structure to impose personal liability is a fact-specific determination, and the factual circumstances surrounding the corporation and the questioned act must be closely scrutinized in each case." *Id.* (internal citations omitted).

The relevant factors Virginia courts have considered in applying the veil piercing doctrine include: (1) failure to maintain adequate corporate records or to comply with corporate formalities; (2) commingling of corporate funds with personal funds; (3) undercapitalization of the corporation so as to frustrate creditors; (4) fraudulent transfers of corporate funds by the dominant shareholder; (5) non-functioning of other officers and directors; and (6) breach of a

fiduciary duty to creditors. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit* Co., 540 F.2d 681 (4th Cir. 1976); *Concrete Ready-Mix of Lynchburg, Inc. v. County Green Ltd. P'ship (In re County Green Ltd. P'ship)*, 438 F. Supp. 701 (W.D. Va. 1977), *overruled on other grounds by In re County Green Ltd. P'ship*, 604 F.2d 289 (4th Cir. 1979); *Dana v. 313 Freemason*, 266 Va. 491, 587 S.E.2d 548 (2003); *Greenberg v. Commonwealth*, 255 Va. at 604–05, 499 S.E.2d at 272; *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318 (1993); *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. at 213–14, 360 S.E.2d at 831–32; *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 147 S.E.2d 747 (1966).

Applying these factors, the court would have considerable difficulty in concluding that a sufficient case has been made for piercing the corporate veil. While the evidence establishes a deplorable lack of proper record keeping and a failure to segregate the finances of Seville and the debtor, it does not show that the debtor "used the [company] to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *First Flight*, 266 Va. at 10, 580 S.E.2d at 809-10. As the Virginia Supreme Court has explained, it is not sufficient that "the unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist"; it must also appear that "to adhere to that separateness would work an injustice." *Id.* What is conspicuously lacking here are facts that demonstrate an injustice. Put another way, simply because a creditor who dealt with a corporation or limited liability company is not able to recover from the company does not constitute an injustice, particularly when the evidence does not even remotely establish that the company was used to commit a fraud or that the funds paid by Ms. Purdy were diverted to other uses or were not actually used in the construction of the house on the lot she contracted to

purchase. Here, however, there is the additional consideration that the debtor, under penalty of perjury, has admitted his personal liability for the debt. That admission, the court concludes, is sufficient, when considered with all the other evidence, to find him personally liable for the deposits Ms. Purdy paid to Seville.

A separate judgment will be entered consistent with this opinion.

Date: _____            _____
                                          Stephen S. Mitchell
Alexandria, Virginia                      United States Bankruptcy Judge


Copies to:

C. Thomas Brown, Esquire
Silver & Brown
10621 Jones Street, Suite 101
Fairfax, VA 22030
Counsel for the plaintiff

Lawrence J. Anderson, Esquire
Pels, Anderson LLC
4833 Rugby Avenue
4th Floor
Bethesda, MD 20814
Counsel for the defendant